SEARS, ROEBUCK & CO., A CORPORATION, PLAINTIFF-RESPONDENT, v. KELSEY HOLDING CO., A CORPORA-TION, DEFENDANT-APPELLANT, AND SOUTH ORANGE TRUST COMPANY, A CORPORATION, AND SCOTTISH UNION AND NATIONAL INSURANCE COMPANY, A CORPORATION, DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued March 22, 1954—Decided April 22, 1954.

Before Judges EASTWOOD, JAYNE and CLAPP.

*Mr. Bernard Freedman* argued the cause for appellant (*Messrs. Koehler, Augenblick & Freedman,* attorneys).

*Mr. Saul J. Zucker* argued the cause for respondent (*Messrs. Kristeller & Zucker,* attorneys).

The opinion of the court was delivered by

JAYNE, J. A. D. The principles of equity lead the way to a just decision of this case. An epitome of the facts which we believe the trial judge was justified in adopting will be adequately informational.

Evidenced by written instruments dated July 5, 1945 and April 24, 1947, the United States Realty & Investment Company leased to the plaintiff for a term of 25 years commencing January 1, 1947 the three-story building designated as

No. 271-85 Hobart Street in the City of Perth Amboy. In July 1947 the defendant Kelsey Holding Co. acquired the property together with an assignment of the lease and the plaintiff thereupon attorned. That relationship has since continued.

Certain terms of the lease have cogent pertinency:

"Tenant further agrees to pay as additional rental hereunder all real estate taxes levied and assessed against the demised premises * * * and all insurance premiums paid by Landlord in connection with the insuring of the demised premises * * *.

Insurance provided for herein shall include standard fire insurance policies and also include 'Additional Hazards Supplemental Contract (Extended Coverage Endorsement)' * * * and all policies shall at all times be in an amount sufficient to cover the full reproductive value of all the improvements on the demised premises. All policies shall indicate the respective interests of mortgagees, Landlord and Tenant, and the originals thereof shall be lodged with the mortgagees and certificates thereof with the Landlord.

* * * * * * * *

If the demised premises or any building or improvement now or hereafter erected thereon, shall during the first twenty years of the term hereof be destroyed or damaged in whole or in part, by fire or other cause, the same shall be promptly repaired, rebuilt and replaced by the Landlord, using insofar as the policies thereon apply, the proceeds collected for (from) them. Such rebuilding shall be as nearly as possible of the character of the building or improvement existing immediately prior to such occurrence, and the Landlord shall in no event be called upon to repair, replace or rebuild any of the said buildings or improvements, or to pay any of the cost or expense thereof beyond or in excess of the proceeds of the insurance policies. There shall be no abatement of rent during the period of reconstruction and rebuilding * * * this lease shall not terminate or be affected in any manner by reason of damage to or total or substantial destruction of the buildings now or hereafter erected upon the demised premises, or by reason of the untenantability of the demised premises or any part thereof."

On May 19, 1950 the memorable explosion occurred at the piers of the Pennsylvania Railroad Company in South Amboy. Perth Amboy was within the area of devastation. The premises occupied by the plaintiff were damaged. The windows and doors were blown out by the blast, and the ceilings and partitions were ravaged. Emergency action

such as the boarding of the windows and doors of the building was immediately undertaken by the plaintiff.

Observable by a reading of the quoted terms of the lease are the contemplated obligation of the landlord to insure the demised premises against damage or destruction by fire or other cause at the expense of the tenant and the express intention that the policies of insurance so procured shall be drawn to protect the respective interests in the premises of the mortgagees, landlord, and tenant.

It became known, after the occurrence of the disaster, that the applicable insurance coverage underwritten by the Scottish Union and National Insurance Company did not, by inadvertence or some other unelucidated reason, embrace as it should have done the interest of the tenant in the premises. The tenant, however, paid the premiums.

A further perusal of the quoted terms of the lease reveals that in the event the building situate on the demised property should during the first 20 years of the tenancy be injured in whole or in part by fire or other cause, the damage shall be promptly repaired by the landlord at a cost, if necessary, equivalent to but not exceeding the proceeds derived from the insurance. The importance and cogency of the landlord's obligation promptly to repair or reconstruct the building becomes exceedingly manifest when placed in parallel with the provision of the lease declaring that during the period of the reconstruction of the damaged building there shall be no suspension, termination or abatement of the liability of the tenant for the payment of the regular rent, and just so notwithstanding the demised premises are during that interval untenantable.

Lost time is something that cannot be later found and restored. In the existing situation a prompt repair of the demised premises was of grave and urgent significance to the tenant in the continuity of its business, but evidently of much inferior concern to the landlord. Be aware that the tenant was the occupant of this three-story building in which it was conducting a retail department store in the business center of the city. It had in its engagement some

150 employees. Indicative of the damage, for example, approximately $2,000 worth of window glass had been blown out or shattered.

Four days after the occurrence of the explosion the landlord communicated with its insurance broker requesting an investigation of the demised premises and the employment of a designated firm of adjusters. Twelve days after the happening of the calamity the attorney of the landlord informed the tenant that:

"A representative of our company has already made an examination of the premises and has called upon a building contractor to advise our company as to damages sustained to the building.

As soon as these damages are ascertained, my client will promptly repair any parts of the building that need repair as a result of the recent explosion."

In the emergent circumstances the tenant undertook in order of importance the making of the requisite repairs. In a communication bearing date June 8, 1950 the landlord imparted to its broker the information which it had received from the tenant that a representative of the insurance company had not as yet visited the demised premises to ascertain the damage and that the tenant was proceeding to make "some necessary repairs." The letter does not embody any intimation of any objection by the landlord to that undertaking by the tenant.

The repair work continued conspicuously to progress and a manifestation of the attitude of the landlord has a setting in the letter addressed by the landlord's broker to the tenant under date of June 21, 1950, the pertinent portions of which are here reproduced:

"Pursuant to our letter dated June 9, 1950 the adjustment of the loss on your building has now nearly reached a point of settlement. However, before final settlement can be arrived at it is important that we receive from you an itemized list of all expenses in connection with the building loss you have had in this building, or any other expenses that are contemplated on this building, so that all figures you have can be presented, so that the adjustment of this loss will include every bit of expense that you have had or contemplate, that is directly attributed to the building loss item.

"We, therefore, appreciate that you will gather all substantiating evidence such as estimates, bills or any other items that you believe are part of this building loss, and forward them to this office in duplicate, if possible, so that the settlement of this loss may be facilitated, with the idea of getting an early settlement of this claim."

On June 23, 1950, although the repairs had not then been completed, the tenant responsively forwarded to the broker an itemized statement of those repairs completed, their nature, the names of the concerns that supplied the labor or materials, and the amounts of money expended by the tenant for each item, to which list was appended a designation of the repairs then unfinished and their estimated cost. On July 12, 1950 the landlord placed this statement at the disposal of its adjuster in the negotiations on behalf of the landlord for the recovery of insurance. On July 11, 1950, the day previous, the landlord through its attorney expressed its attitude: "Under our lease it is the obligation of the tenant to take care of all repairs both interior and exterior."

In total the tenant actually expended the sum of $4,337.82 for the necessary restoration of the demised premises. The landlord neither did nor paid anything whatever to repair the building.

But let us notice what happened next. The landlord availed itself of the expenditures made by the tenant as a basis of its claim upon the insurance company for the damage to the building and on October 18, 1950 the then attorney of the landlord addressed the following letter to the attorneys of the tenant:

"I cannot understand upon what basis you claim any part of the insurance damage proceeds and especially advise our adjusters as to how much your client would be willing to accept.

Under the terms of the lease I cannot see where you are entitled to any money at all.

The bills which you forwarded cover work you did for yourself and which you are obligated to do.

I am advising my client to make settlement and further that they are under no obligation to make any payment to you at all."

The landlord, having encouraged and awaited the completion of the repairs by the tenant and doubtless cheerfully anticipating the anomalistic but fortuitous eventuality of deriving a profit from the occurrence of the explosion, compromised its claim against the insurance company for the sum of $4,200 on November 13, 1950.

The attorney then representing the landlord had dispatched a message in writing to the tenant in which he stated: "This is to advise you that my client (the landlord) does not intend to pay Sears Roebuck any part of the proceeds of any settlement on the insurance company claim."

The insurance company ultimately forwarded a draft for $4,200 to the South Orange Trust Company payable to the trust company as mortgagee and to the landlord as owner. In view of the circumstances the trust company was a little tardy in endorsing the draft to the order of the landlord. It is reasonably imaginable that the trust company cogitated the idea that if such a treasure-trove had gratuitously descended upon the landlord, it might more prudently be credited upon the mortgage.

Read the admonitive notice of danger that the same attorney on November 24, 1950 addressed to the trust company:

"I represent Kelsey Holding Co. owner of property in Perth Amboy who have presented to you a draft from their insurance company in the sum of $4200.00 for endorsement. All damage has been repaired, and you are therefore obligated to endorse this draft.

I understand that you have failed to endorse this draft.

This is formal notice to you that the draft will be presented to you for endorsement on Monday, November 27th, 1950 for your endorsement. In the event that you fail to endorse this draft, as you have no interest in same, I shall take legal action against you, and there will probably be legal expense and costs for you to pay.

I think that you are violating your trustee relationship, and in the legal action to be brought, I shall ask the court to remove you as trustee."

On November 28, 1950 the present action was instituted by the tenant as plaintiff in the Chancery Division of this court against the landlord, the trust company, and the insurance company as defendants to enjoin the disbursement of

the proceeds of the draft and to require the landlord to reimburse the plaintiff-tenant from the proceeds recovered by the landlord under the policy for the expenditures made by the plaintiff-tenant in the restoration of the building on the demised premises. Appropriate restraints to preserve the *res* were granted and subsequently discharged by the submission of a protective bond by the defendant-landlord.

The alleged causes of action against the trust company and the insurance company were thereafter voluntarily dismissed by the plaintiff. At the conclusion of the final hearing, at which the facts to which we have alluded were adequately established, Judge Freund resolved that a monetary judgment should be entered in favor of the plaintiff and against the defendant-landlord in the sum of $4,071.22.

The defendant now asserts on appeal that under applicable principles of law it has suffered an illegal deprivation of its opportunity to capture the insurance for its own use without reimbursing the plaintiff for the cost of the repairs for which the insurance supplied the indemnification. The frail point suggested is that the defendant was prevented or perhaps should be excused from its dereliction in not making the repairs because of the acts of the plaintiff in doing so. How can this be? It need only be recalled that the defendant expressly disclaimed its contractual obligation to make the repairs. It obviously had no intention to make them or certainly not promptly.

The contention that in the circumstances the plaintiff should be placed in the legal category of a volunteer is equally unimpressive.

The argument that in the absence of any contractual relationship between the insurance company and the plaintiff, the latter is not entitled to the proceeds of the adjustment is manifestly based upon a misconception of the plaintiff's cause of action. The plaintiff in view of the terms of the lease, the dereliction of the defendant and the restoration of the demised premises seeks reimbursement from the defendant not exceeding in amount the proceeds of the insurance as limited by the pertinent provision of the lease.

However alphabetized, it is a distinctly equitable cause of action against the defendant arising out of the particular circumstances. It implicates the contractual relationship between the plaintiff and the defendant and not the insurance company.

A subsidiary reason advanced for reversal is that competent proof was not introduced at the trial of the reasonableness of the expenditures made by the plaintiff. In even one respect this point is somewhat astonishing. The defendant obtained at its request from the plaintiff the cost figures, adopted them as reasonable in its sworn proof of loss which it submitted to the insurance company and by which it received the $4,200, and now in this litigation seeks to impugn them. No! No!

In our review of this case we notice a relatively small expenditure made by the defendant incident to the collection of the insurance to which our attention is invited by the appellant's brief. The defendant paid the adjusters, Sarasohn & Co., a fee of $315 for services in negotiating a settlement of the insurance loss. We regard it to have been a proper item of expense in the recovery of the insurance claim. Additionally we are of the opinion that the intended import and meaning of the word "proceeds" in the applicable paragraph of the lease is "net proceeds." The deduction of this item of expense incurred in the recovery of the insurance reduces the net proceeds to $3,885. The plaintiff's judgment should accordingly be in the sum of $3,885.

In all other respects the conclusion of the trial judge was eminently just and equitable.

As modified, the judgment is affirmed, with costs.